Alfred MONTOYA, Plaintiff–Appellant,

v.

UNITED STATES PAROLE COMMISSION, Defendant–Appellee.

No. 89–6122.

United States Court of Appeals, Tenth Circuit.

July 12, 1990.

Alfred Montoya, pro se.

Robert E. Mydans, Interim U.S. Atty., and Debra A. Woods, Asst. U.S. Atty., Oklahoma City, Okl., on the briefs for defendant-appellee.

Before McKAY, SEYMOUR, and TACHA, Circuit Judges.

SEYMOUR, Circuit Judge.

Alfred Montoya brought this application for habeas corpus relief challenging the decision of the United States Parole Commission to set his parole date outside the applicable guideline range. The district court denied relief. Montoya appeals and we reverse.[1]

The Parole Commission is mandated by statute to promulgate guidelines for the exercise of its parole powers. *See* 18 U.S.C. § 4203(a)(1) (1982), *repealed* effective Nov. 1, 1987, by the Sentencing Reform Act of 1984, Title II, §§ 218(a)(5), 235, 98 Stat. 1837, 2027, 2031.[2] These guidelines are meant to reduce the disparity in treatment of similarly situated inmates by providing "a fundamental gauge by which parole determinations are made." H.R. Conf.Rep. No. 838, 94th Cong., 2d Sess. 26, *reprinted in* 1976 U.S.Code Cong. & Admin.News 335, 359. Congress thus intend-

---

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R. App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.

2. The statutes cited in this opinion, now repealed, apply to the determination of Montoya's parole release date. *See Lewis v. Martin,* 880 F.2d 288 (10th Cir.1989).

ed that the guidelines "serve as a national parole policy which seeks to achieve both equity between individual cases and a uniform measure of justice." *Id.* To do so, "[t]he guidelines take into account the circumstances of the individual both in his personal life and with respect to the offense which he has committed, as well as measuring the severity of the offense involved so as to significantly reduce the area of discretion which the Parole Commission, in fact, has in any given case. The guidelines give definiteness to the indefinite nature of most federal criminal cases by reducing the opportunity for sentencing disparity and abuse of discretion and by giving to parole an aura of fairness for both victim and offender." S.Rep. No. 369, 94th Cong. 2d Sess. 18, *reprinted in* 1976 U.S.Code Cong. & Admin.News 335, 340.

 The Commission is authorized to "deny release on parole notwithstanding the guidelines ... if it determines that there is good cause for so doing: *Provided,* that the prisoner is furnished written notice stating with particularity the reasons for its determination, including a summary of the information relied upon." 18 U.S.C. § 4206(c) (1982), *repealed* effective Nov. 1, 1987, by the Sentencing Reform Act of 1984, Title II, §§ 218(a)(5), 235, 98 Stat. 2027, 2031. However, if the guidelines are to perform their function of promoting both equality of treatment and the appearance of equity, departures must be the exception. "If decisions to go above or below parole guidelines are frequent, the Commission should reevaluate its guidelines." S.Rep. No. 369, 1976 U.S.Code Cong. & Admin.News at 360. Congress has cautioned that good cause for departure "means substantial reason and includes only those grounds put forward by the Commission in good faith and which are not arbitrary, irrational, unreasonable, irrelevant or capricious." *Id.* at 359. The Commission's decision to set a release date outside the guidelines under this provision will be affirmed if " 'there is a rational basis in the record for the Commission's conclusions embodied in its statement of reasons.' " *Misasi v. United States Parole*

*Comm'n,* 835 F.2d 754, 758 (10th Cir.1987) (quoting *Solomon v. Elsea,* 676 F.2d 282, 290 (7th Cir.1982)).

The guidelines establish a presumptive parole date by rating the severity of an offender's crime and his salient factor score, which is the risk that he will violate parole. *See* 28 C.F.R. § 2.20 (1989). An offender's salient factor score, or parole prognosis, is determined by considering the following factors: the number of prior convictions, from none to four or more; prior commitments of more than thirty days, from none to three or more; the offender's age at the time of committing the current offense; whether the offender had been released from commitment for three years prior to the current offense; whether the offender was on probation, parole or in confinement; and the offender's history of drug dependence. *Id.*

In 1983, Montoya was convicted on a guilty plea to one count of conspiracy to import cocaine and one count of transporting a firearm in interstate commerce after a former felony conviction. He received a seven-year term on the conspiracy count and a five-year concurrent sentence on the firearm count. Montoya was on parole from a 1967 conviction at the time these crimes were committed and his sentences on these crimes were to run consecutively to his parole violation term.

 The Parole Commission informed Montoya that a decision to go outside the guidelines with respect to his 1983 convictions was warranted because:

"[Y]ou are a more serious risk than indicated by your salient factor score in that you have a history of assaultive/aggressive behavior, specifically: 1958—robbery; and 1967—murder. Your criminal behavior began in 1953 and has continued until the present time. Less than three years subsequent to your release in 1980, after 13 years of confinement, you involved yourself in new serious criminal behavior involving drugs and possession of a firearm."

Rec., vol. I, doc. 1, ex. E, at 2. Montoya contends that the record contains no sup-

**638**

port for the Commission's conclusion that, due to his history of assaultive/aggressive behavior, he was a more serious risk than indicated by the guidelines. We agree.

The Commission relied on two prior offenses in finding that Montoya had a history of assaultive/aggressive behavior, a 1958 robbery conviction and a 1967 murder conviction. The presentence report prepared in connection with the 1983 convictions describes the 1958 robbery conviction as follows:

"Under Long Beach Superior Court case # 205747, Montoya was sentenced to State Prison as noted after he and his brother, Harold, were convicted of entering an apartment where a poker game was in progress and robbing the participants. Alfred Montoya had a gun in his hand while his brother, Harold, had a lug wrench in his hand. While robbing the victims, Harold Montoya hit one of them on the head twice because he refused to give up the money in his pockets. Alfred Montoya explains that this robbery occurred because the individuals whom he and his brother robbed on this date had robbed the Montoya brothers on a prior occasion."

Rec., vol. I, doc. 3, def. ex. 19, at 8. The 1967 murder conviction arose out of an attempt by Montoya, his brother, and two others to import marijuana across the border from Mexico. When they were stopped by two border patrol agents, the agents were taken prisoner by the other defendants. Montoya was instructed to take the vehicle containing the marijuana to his home, which he did. The remaining defendants took the agents to a remote area and shot them. *Id.* at 10.

Montoya points out that the 1967 conviction was on a charge of felony murder and that, as set out above, the undisputed facts in the record establish that he had no part in the actual killings and was not present when they were committed. In denying Montoya relief, the district court concluded that the Commission's decision was supported by some evidence because the record includes "presentencing reports that

contained conflicting versions of whether the petitioner was present at the time of the 1967 murders." *Id.*, vol. I, doc. 9, at 6. Our review of the record reveals only one presentence report, which was prepared for sentencing on the 1983 crimes. It states unequivocally in describing the 1967 murders that although Montoya was present when the victims were taken prisoner by Montoya's co-defendants, those co-defendants sent Montoya home before the killings occurred. *See id.* at doc. 3, ex. 19, at 10. Other Commission documents likewise state that Montoya did not shoot the victims, and was not present at the scene when they were shot. *Id.* at doc. 3, def. ex. 4, def. ex. 5. Accordingly, the 1967 conviction does not support the Commission's finding that Montoya has a history of assaultive/aggressive behavior.

The dissent disagrees, arguing that the record contains evidence of Montoya's knowing participation in the 1967 murders. In support of this conclusion, the dissent relies on the language of 18 U.S.C. § 1111, the statute under which Montoya was convicted in 1967, which defines murder as "the unlawful killing of a human being with malice aforethought." The dissent believes that the term "malice aforethought" is some indication that Montoya knowingly participated in the murders. That inference is not valid given the undisputed facts in the record. Malice aforethought as used in section 1111 is a common law term and is therefore interpreted by reference to the common law. *See United States v. Fleming,* 739 F.2d 945, 947 n. 2 (4th Cir.1984). The Commission does not dispute that Montoya's murder conviction under section 1111 was premised on the felony-murder doctrine, *see* Appellee's Brief at 7, under which one is guilty of murder if a death occurs during the commission of a felony, *see, e.g.,* Model Penal Code § 210.2 comment 6 (Official Draft & Revised Comments 1962). Under the common law, felony murder is in essence a strict liability crime, allowing conviction for a death that was unintended and unforeseen. *See generally* W. LaFave & A. Scott, Jr., *Crimi-*

*nal Law* §§ 67, 71 (1972);[3] Model Penal Code § 210.2 comments 1, 6.

When, as here, a defendant has been convicted of felony murder, a judgment of conviction stating "murder with malice aforethought" indicates only that the murder occurred in conjunction with a felony. Because the element of malice is supplied by the commission of the felony, the order of judgment and conviction cannot be read to indicate that Montoya knowingly participated in the murders.

The dissent also attempts to distill from this record some support for its assertion that Montoya's conduct during the 1967 crimes was itself aggressive/assaultive behavior. In so doing, the dissent ignores the record in critical respects. First, the dissent disagrees with our assumption that Montoya's conviction rested on the felony murder doctrine. However, as stated above, the government has *conceded* this fact. Second, we cannot agree with the dissent's assertion that, even if Montoya's 1967 convictions rest on the felony murder doctrine, the record can be read to support Montoya's active involvement in the underlying felony. The indictment reveals that the two co-defendants who actually disarmed the Border Patrol Agents, sent Montoya on his way with the marijuana, and then took the Agents away and shot them, were charged with robbing the Agents in violation of 18 U.S.C. § 2112, as well as with murder. Significantly, Montoya was not charged with robbery, and there is no evidence that he played any part in that crime, knew it was going to occur, or was present when it was completed.[4] Indeed, the record reveals that Montoya's relatively early parole date on the 1967 convictions was based on the Board's belief that Montoya was the least culpable of the defendants. *See* rec., vol. I, doc. 3, defendant's ex. 5. In sum, the dissent's assertion that the record can be read to support Montoya's knowing and active participation in the violent aspects of the 1967 crimes is utterly unsupported.

Although the Commission also relied on a 1958 conviction for robbery, we do not believe that one incident, standing alone, is sufficient to establish a *history* of assaultive/aggressive behavior, particularly when the evidence is undisputed that while Montoya carried a gun during that crime, it was his co-defendant who assaulted the victim with a wrench.

As we stated in *Misasi*, 835 F.2d at 758, when a reason given by the Commission for going above the guidelines is factually incorrect or unsupported by the record material upon which the Commission specifically relies, it does not constitute a rational basis for the Commission's action. Here the primary reason stated by the Commission for departing from the guidelines is Montoya's history of assaultive/aggressive behavior, a reason we conclude has no rational basis in the record.[5]

3. LaFave also notes:
"Murder is a common law crime whose complete development required several centuries. Though murder is frequently defined as the unlawful killing of another 'living human being' with 'malice aforethought," in modern times the latter phrase does not even approximate its literal meaning. Hence it is preferable not to rely upon that misleading expression for an understanding of murder but rather to consider the various types of murder (typed according to the mental element) which the common law came to recognize and which exist today in most jurisdictions." LaFave at 528.

4. The indictment distinguishes between Montoya and the co-defendants in the murder counts as well. The murder counts against the co-defendants charged them with murder "by means of shooting" and "with premeditation," rec., supp. vol. I at 1, phrases missing from Monto-

ya's charge. This omission indicates the felony murder basis of Montoya's conviction. In addition the co-defendants were sentenced to 30 years plus life, while Montoya was sentenced to two 30 year concurrent terms and paroled after 13 years.

5. Montoya also argues that the Commission failed to specify with particularity why his prior criminal history justified the decision to go above the guidelines, asserting that he is no poorer a parole risk than the typical offender in his guideline range. In a related argument, Montoya contends that the Commission used impermissible double-counting. The Commission relied on the fact that the 1983 offenses occurred less than three years after his release from commitment, even though this fact is considered in determining an offender's salient factor score. In view of our rejection of the Commission's primary reason for going outside

■ In addition, we conclude that the Commission's action is arbitrary and capricious for another reason. As discussed above, the Commission relied only on the 1958 robbery conviction and the 1967 murder convictions to conclude that Montoya's history of aggressive/assaultive behavior made him a more serious parole risk than indicated by his salient factor score. However, these same crimes were before the Commission when it considered Montoya's parole on the 1967 convictions. At that time, the Commission did not believe that these crimes dictated an upward departure from the guidelines; to the contrary, the Commission granted Montoya a relatively early parole within the guidelines based on its conclusion that Montoya was the least culpable participant in the 1967 murders. The Commission has failed to explain why the same two crimes justify two diametrically opposed parole decisions.[6]

Accordingly, we reverse and remand with directions that the district court vacate its judgment and order, and remand the case to the Parole Commission with directions that it vacate its decision and order and that further proceedings it may conduct be consonant with the views expressed herein.

REVERSED.

. TACHA, Circuit Judge, dissenting.

I respectfully dissent from the majority opinion because I find a rational basis in the record for the Parole Commission's determination that Montoya has a history of assaultive and aggressive behavior. I therefore would uphold the Parole Commission's decision to go above the parole guidelines and deny parole.

The Parole Commission stated the following reasons for going above the parole guidelines:

Retroactivity does not apply. Neither your recalculated severity rating (old category—Category Six; new category—Category Six) nor your recalculated salient factor score risk category (old category—Poor, old score—1; new category —Poor, new score—1) is more favorable. Your new offense/parole violation has been rated as new criminal conduct of Category Six severity because of your non-peripheral role in the intended distribution of at least 1 kilogram of pure cocaine. You were also convicted of interstate transportation of firearms by a convicted felon. Your new salient factor score is 1. The adult guidelines are applicable to your case. You have been in federal confinement as a result of your violation behavior for a total of 38 months. Reparole guidelines indicate a customary range of 78–100 months to be served before re-release. After review of all relevant factors and information presented, a decision above the guidelines appears warranted because you are a more serious risk than indicated by your salient factor score in that you have a history of assaultive/aggressive behavior, specifically: 1958—robbery; and 1967—murder. Your criminal behavior began in 1953 and has continued until the present time. Less than three years sub-

the guidelines and our conclusion that Montoya's eligibility for parole must therefore be reconsidered, we do not address these arguments in detail. However, because of the Commission's mandate to state its reasons with particularity and this court's condemnation of double-counting, *see, e.g., Castaldo v. United States Parole Comm'n,* 725 F.2d 94, 96 (10th Cir.1984), Montoya's arguments are not without some support in the law and the record. Accordingly, if on remand the Commission chooses to go above the guidelines on the basis of Montoya's prior criminal history and the length of his commitment-free period, it should explain how these factors shed light on Montoya's parole prognosis in a way different from the way they function in setting his salient factor score. *See id.* at 96–97.

**6.** We note some indication in the record that a factor in the Commission's decision here challenged may have been not the aggressive/assaultive history upon which the Commission purported to rely, but the fact that Montoya "was given the opportunity to amend his ways by a parole grant and has chosen to resume his activity in trafficking in narcotics." Rec., vol. I, doc. 3, defendant's ex. 5, at 1–2. Even if this is a legitimate consideration in the parole determination not adequately considered in setting Montoya's salient factor score, but *see* note 5 *supra,* our review must be based on the reasons actually provided Montoya by the Commission.

sequent to your release in 1980, after 13 years of confinement, you involved yourself in new serious criminal behavior involving drugs and possession of a firearm.

Our inquiry must begin with the appropriate standard of review in mind. "Judicial review of Parole Board decisions is narrow. The standard of review of action by the Parole Commission is whether the decision is arbitrary and capricious or is an abuse of discretion." *Nunez–Guardado v. Hadden,* 722 F.2d 618, 620 (10th Cir.1983). Our review of the Parole Commission's decision necessarily requires some inquiry into the evidence relied upon by the Parole Commission to support its expressed reasons for denying parole. This factual inquiry, however, is limited.

> A court of review need only determine whether the information relied on by the Commission is sufficient to provide a factual basis for its reasons. The inquiry is not whether the Commission's decision is supported by the preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the Commission's conclusions embodied in its statement of reasons.

*Misasi v. United States Parole Com'n,* 835 F.2d 754, 758 (10th Cir.1987) (quoting *Solomon v. Elsea,* 676 F.2d 282, 290 (7th Cir. 1982)).

I disagree with the majority's conclusion that Montoya's 1967 second degree murder convictions are not evidence of aggressive and assaultive behavior. Montoya's November 1967 order of judgment and conviction for second degree murder states:

> On or about the 17th day of June, 1967, in Riverside County, in the Central District of California, *the defendant, with malice aforethought, killed and murdered George Azrak and Theodore Newton,* Jr., who were the immigration officers, to wit, Border Patrol Inspectors in the Immigration and Naturalization Service of the Department of Justice, engaged in the performance of their official duties ... in violation of Title 18, United

States Code, sections 1111, 1114.... (emphasis added.)

Section 1111(a) of title 18 defines Montoya's 1967 offenses as follows:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree. 18 U.S.C. § 1111(a) (1948) (current version at 18 U.S.C. § 1111(a) (1984)). The definition of "malice aforethought" under federal law is well established:

> "Malice aforethought" means an intent, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life.

*United States v. Harrelson,* 766 F.2d 186, 189 n. 5 (5th Cir.1985) (quoting 2 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* 215 (1977)), *cert. denied,* 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241; *see United States v. Chagra,* 807 F.2d 398, 402 (5th Cir.1986) (applying definition to 18 U.S.C. section 1111(a)), *cert. denied* 469 U.S. 1193, 105 S.Ct. 970, 83 L.Ed.2d 973; *United States v. Fleming,* 739 F.2d 945, 947–48 (4th Cir.1984) (same). This court also has discussed the meaning of "malice aforethought" in section 1111(a), and held that "[m]alice aforethought may be established by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that *the defendant was aware of a serious risk of death or bodily harm."* *United States v. Soundingsides,* 820 F.2d 1232, 1237 (10th Cir.1987) (emphasis added) (citing *United States v. Black Elk,* 579 F.2d 49, 51 (8th Cir.1978)). Montoya en-

tered a guilty plea, therefore a jury never passed on the evidence of his conduct. However, under Federal Rule of Criminal Procedure 11, which was in effect at the time of the 1967 convictions, the court was obligated to inquire and satisfy itself that there was a factual basis for Montoya's guilty plea before entering judgment. *See* Federal Rule of Criminal Procedure Rule 11(f), 18 U.S.C. (current version).

As LaFave and Scott explain, at least four modern types of murder are included under the penumbra of murder defined as the unlawful killing of another living human being with "malice aforethought:" (1) intent to kill murder; (2) intent to do serious bodily injury murder; (3) depraved heart murder; and (4) felony murder. *See* 2 W. LaFave & A. Scott, *Substantive Criminal Law* § 7.1 at 181–83 (1986) (hereinafter 2 LaFave & Scott). The first three types of murder all have a mens rea requirement related to the killing. Felony murder is included under this definition of "malice aforethought" because the element of malice, usually "callous and wanton disregard of the consequences to human life," is supplied by intent to commit the underlying felony. At common law and today the underlying crimes for felony murder are limited to those felonies involving a danger to life, such as where the felony involves an act of violence or where death is a natural and probable consequence of the defendant's conduct in committing the felony. *See* 2 LaFave & Scott at § 7.5(a)–(b). All four types of murder are theoretical possibilities for a second degree murder conviction under section 1111(a).

My first point of disagreement is with the majority's assumption that Montoya's conviction was a form of strict liability imposed under the felony murder doctrine. Of the four theoretically possible types of second degree murder under section 1111(a), the majority ignores without explanation the three types of murder requiring mens rea and assumes that simply because Montoya was not present for the execution of the two border patrol agents, he could not have intended or foreseen their deaths.

It is undisputed that Montoya was present when the two border patrol agents were kidnapped and disarmed. However, the Parole Commission reports and the presentence report *are silent on the question of Montoya's knowledge and state of mind at the time of the kidnapping.* Montoya argued before the Parole Commission that he left the scene with no knowledge that the murders were going to take place, but the Parole Commission did not speak to this issue except to say that of the four defendants, Montoya was the "least culpable." From this equivocal record the majority infers that Montoya's 1967 convictions were strict liability offenses, and concludes that the convictions therefore do not show aggressive and assaultive behavior. However, an equally likely inference from the record is that Montoya knew, or should have known, that his coconspirators were going to kill or seriously injure the two border patrol agents after he left to complete the marijuana delivery. Montoya's knowledge or reckless disregard of the danger to the victims and his acquiescence would satisfy the mens rea requirement for, at a minimum, depraved heart murder. Montoya's 1967 murder convictions would be possible on this ground under an accomplice theory of liability even though he was not actually present when the murders took place. *See* 2 LaFave & Scott at § 6.7. In short, I see two equally likely inferences from this record regarding Montoya's mens rea for the 1967 murder convictions, one of which supports the Parole Commission's conclusion that Montoya has a history of assaultive and aggressive behavior.

However, assuming arguendo that Montoya's 1967 murder convictions were based on the felony murder doctrine, my second point of disagreement is that the majority fails to explain why the felony underlying the murder conviction is not indicative of assaultive and aggressive behavior. Although the 1967 murder conviction does not specify an underlying felony, the presentencing report shows that Montoya was involved in the kidnapping of the two agents.

Kidnapping was perceived at common law and is still perceived by legislatures

today as a dangerous offense involving a significant prospect of violence. For these reasons it is included in most modern felony murder statutes. *See* 2 LaFave & Scott at § 7.5(b). Indeed, in 1984 Congress amended section 1111(a) to include kidnapping as an underlying felony supporting first degree murder. Act of Oct. 12, 1984, Pub.L. No. 98–473, 98 Stat. 2138 (1984). Congress's inclusion of kidnapping in the list of felonies supporting murder in the first degree without any reference to the particular circumstances is a strong indication of the assaultive and aggressive nature of this crime, and in my mind forecloses any potential debate that we should look to see whether under the facts of a particular case there was a foreseeable danger to human life. *See* 2 LaFave & Scott at § 7.5(b). If Montoya's 1967 murder convictions were for felony murder, it is improper to collaterally attack the factual basis for those convictions in a subsequent parole proceeding by denying that Montoya's actual role in the kidnapping constitutes evidence of assaultive and aggressive behavior.

No matter which way I read this equivocal record, evidence of Montoya's aggressive and assaultive behavior appears at every option. The record is silent on Montoya's mens rea at the time of the kidnappings. We cannot know and we should not assume which one of the four potential types of murder was the basis for Montoya's second degree murder convictions. However, if we assume, as the majority does, that Montoya's convictions were for felony murder and that Montoya did not intend and could not foresee that his cohorts would murder the border patrol agents, his undisputed involvement in their kidnapping of the agents is sufficient evidence of Montoya's assaultive and aggressive behavior.

I find that a rational basis exists in the record to support the Parole Commission's determination that Montoya's 1958 robbery offense, coupled with his involvement in the 1967 murders, show a history of assaultive and aggressive behavior. Accordingly, I would hold that the Parole Commis-

sion's action was not arbitrary, capricious, or an abuse of discretion.